1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

9

**SOUTHERN DISTRICT OF CALIFORNIA**

10

11    JESUS LOPEZ,                                    Case No.  13-cv-00597-BAS(WVG)

12                                    Plaintiff,      **ORDER DENYING IN PART**
                                                      **AND GRANTING IN PART**
13          v.                                        **DEFENDANTS' MOTION FOR**
                                                      **SUMMARY JUDGMENT**
14

15    CITY OF IMPERIAL, *ET AL*.                      (ECF No. 25)

16                                    Defendants.

17

18

19          Plaintiff Jesus Lopez ("Lopez") commenced this action against Defendants

20    Albert Valenzuela, Edman Escallada, the City of Imperial, and Chief Miguel Colon

21    (collectively "Defendants") on or about December 21, 2012 in San Diego Superior

22    Court.[1]  Lopez alleges Defendants violated his federal civil rights and various state

23    laws during a traffic stop.  (*See* ECF No. 1-1 ("Compl.").)  Defendants removed the

24    action to federal court on March 14, 2013 based on federal question jurisdiction.

25    Defendants now move for summary judgment on Lopez's claims.  (ECF No. 25

26    _____

27          [1]      The Complaint incorrectly lists the names of Defendants Escallada and
28    Colon as "Edmand Escallada" and "Michael Cologne," respectively.  The Court will
      use their correct names herein.

("Mot.").)  Lopez opposes.  (ECF No. 31 ("Opp").)

The Court heard oral argument on the motion from all parties on June 25, 2015. For the reasons set forth below, the Court **DENIES IN PART** and **GRANTS IN PART** Defendants' motion for summary judgment.

## I.  FACTUAL BACKGROUND[2]

### A.  Dispatch Call and Traffic Stop

On the night of May 11, 2012, Lopez, a former deputy with the Imperial County Sheriff's Department and current part-time District Enforcement Officer with the United States Marshal's Office, noticed a truck following his car.  (ECF No. 31-2 at Ex. 1 ("Lopez Dep.") at 37:14-15, 47:12, 49:16-50:21, 66:3-9.)  Unbeknownst to Lopez, the truck belonged to an off-duty border patrol agent, Jose Fonseca ("Fonseca").  (ECF No. 25-4 at Ex. 3 ("Escallada Dep.") at 10:14-15, 12:5-7; ECF No. 25-5 at Ex. 5 ("Fonseca Decl.") at ¶ 2.)  After observing Lopez's vehicle allegedly swerving on the road, Fonseca radioed for police to investigate the car in front of him as a potential drunk driver.  (Fonseca Decl. at ¶¶ 2, 5; Escallada Dep. at 9:21-10:20.)

Defendant Officer Edman Escallada ("Escallada") responded to the call, proceeding to the area and following Lopez's vehicle.[3]  (Escallada Dep. at 10:9-20; 15:4–6.)  After following directly behind the vehicle for approximately four seconds, Escallada signaled Lopez to pull over.  (Dashcam at 55:07–11.)  Lopez noted the lights behind him, alerting him to pull over immediately, but continued to drive toward his residence for 10 seconds before pulling into the driveway of his residence, which was

---

[2]  Plaintiff and Defendants do not dispute the facts related herein, except as noted.

[3]  At this point, Escallada's dash-mounted video camera captured the remainder of the incident.  (*See* ECF No. 25-4, Ex. 2 at ¶¶ 2-3, Ex. A (Dashcam Video 406 ("Dashcam")).)  As the parties do not contest the accuracy of the video's portrayal of the subsequent events, the Court may rely on the sequence of events to the extent they are depicted in the video where both parties' recounts of the recorded events differ.  *See Scott v. Harris*, 550 U.S. 372, 380–81 (2007).

1    also a business.  (*Id.* at 55:11–55:21; Lopez Dep. at 74:21-77:1; 84:25-86:12.)

2          Once Escallada had pulled Lopez over, he retrieved Lopez's license and spoke

3    to Fonseca, who said Lopez had been swerving "all over the road."  (Dashcam at

4    56:11–57:28; Escallada Dep. at 34:1, 14-16, 36:17-25.)  Escallada told Fonseca that

5    Lopez was being "a little uncooperative."  (Dashcam at 57:42.)  Escallada – now

6    accompanied by his supervisor, defendant Officer Albert Valenzuela ("Valenzuela")

7    – returned to Lopez, requesting that Lopez exit his car.  (*Id.* at 58:47; ECF No. 25-5

8    at Ex. 4 ("Valenzuela Dep.") at 37:14–15.)  Lopez complied, demanding to know the

9    identity of the agent who had reported his vehicle, asserting that he was a former

10   deputy sheriff**,** and, when asked if he'd been drinking, repeatedly stating "I'm diabetic.

11   I don't drink."  (*Id.* at 58:50–59:56; Escallada Dep. at 37:9–10, 38:24-39:1, 49:24-25,

12   52:6-9.)

13         The parties dispute Fonseca's characterization that Lopez's vehicle was

14   "swerving," precipitating Escallada's involvement.  (*See* ECF No. 32-1 ("SS.") at

15   Nos. 7-8.)  Lopez states that after noticing Fonseca's vehicle behind him, he became

16   concerned about being followed and was bothered by the vehicle's high beams shining

17   in his mirrors.[4]  (*See* Lopez Dep. at 67:5-7, 70:11-71:6; SS. at No. 27.)  Lopez claims

18   he attempted "five to six" times to encourage the vehicle following him to pass, by

19   pulling into the slow lane of the road.  (Lopez Dep. at 71:2-72:14.)  Fonseca, on the

20   other hand, contends he witnessed Lopez's car "swerv[e] all over the two lanes of

21   northbound traffic[,]" "straddl[e] the center line[,]" and at one point "actually go onto

22   the right dirt shoulder."  (Fonseca Decl. at ¶¶ 2–5.)

23         The parties also dispute whether Escallada independently perceived Lopez

24

25   ───────────────

26        [4]     Lopez and Defendants dispute whether Fonseca had turned on his truck's
     high beams, with Fonseca claiming that he did not have his high beams on at any
27   point.  (Fonseca Decl. at ¶ 7.)  Lopez alternatively suggests that the taller vehicle's
     running lights affected his vision similarly to high beams, since Lopez's car was much
28   lower than Fonseca's truck.  (SS. at No. 17.)

swerving and whether Lopez immediately pulled over for the traffic stop.  Escallada claims he saw Lopez's vehicle's left tire briefly straddle the center median before signaling Lopez to pull over.  (Escallada Dep. at 15:21; 20:6–24.)  This allegation is unsupported by the Dashcam video and denied by Lopez.  (Dashcam at 55:02–55:10; SS. at No. 10.)  Lopez and Escallada also differ in their opinions of whether Lopez's seven-second delay meant he did not "immediately" pull over.  (*See* SS. at No. 12.) Escallada further testified that he did not smell any alcohol on Lopez at the time of the stop.  (Escallada Dep. at 37:16-17.)  However, Escallada claims Lopez's repeated explanations for swerving, "excuses" of being a retired deputy sheriff, and failure to immediately yield all seemed like evidence of intoxication at the time.  (*Id.* at 38:1-39:4, 51:21-24.)  Escallada also claims Lopez's eyes were red at the time, which Lopez denies.  (*Id*. at 60:23; SS. at No. 23.)

### B.    Attempt to Conduct Field Sobriety Test and Arrest

Based on his suspicion that Lopez was intoxicated, Escallada instructed Lopez to take off his hat and asked him to voluntarily take a field sobriety test ("FST"). (Dashcam at 59:47–1:00:30; Escallada Dep. at 78:17-18.)  The Dashcam shows Lopez refusing to take a FST, repeating that "this is bullshit."  (Dashcam at 1:00:28; *see also* Escallada Dep. at 78:17-18.)  At that point, Escallada threatened to arrest Lopez, while Valenzuela approached, identifying himself as the supervisor and admonishing Lopez to "be professional" and cooperate.  (*Id.* at 1:00:56, 1:01:05-01:13.)  When Lopez maintained he would not take the FST, Escallada ordered Lopez to turn around, which Lopez refused to do.  (*Id.* at 1:01:36.)  Escallada attempted to grab Lopez's arms, and Lopez raised his arms above his head and backed into his car's open door.  (*Id.* at 1:01:35–1:01:37.)

The parties dispute Lopez's demeanor at this point.  Escallada testified Lopez was "belligerent, uncooperative, [and] argumentative," signs of intoxication to Escallada.  (Escallada Dep. at 60:16-25, 96:12-17.)  Similarly, Valenzuela testified that Lopez's demeanor was argumentative, questioning, and defensive.  (Valenzuela

Dep. at 26:4-15.)  Valenzuela testified that he considered Lopez's backing away with his arms raised and cornering himself in the car door to be "preaggressive behavior," in response to which Valenzuela pulled out his baton.  (*Id.* at 39:13-40:16.)[5]  Lopez disputes the officers' characterization of his demeanor, asserting he was "talking [to them] calmly and casually . . . in a moderate, non-threatening tone of voice."  (SS. at No. 24.)  Lopez contends he did not take an aggressive stance, but rather that he felt "cornered" against his car door by the officers.  (*Id.* at No. 64.)

### C.    Use of Force Against Lopez

Valenzuela struck Lopez with his baton once, while Escallada ordered Lopez to turn around.  (Dashcam at 1:01:42.)  Valenzuela testified that, at the time, he felt Lopez's size and demeanor constituted a threat to his personal safety.  (Valenzuela Dep. at 40:20-25.)  While Lopez—now offering to do the FST—continued to face the officers, Valenzuela struck Lopez several more times, and Escallada sprayed Lopez's eyes with pepper spray.  (Dashcam at 1:01:49–1:01:54; 1:13:44.)  Shielding his eyes, Lopez moved away from the officers and into his vehicle.  (*Id.* at 1:01:54.)

Both Valenzuela and Escallada reached into the car, attempting to pry Lopez out.  (*Id.* at 1:02:04.)  During the struggle, Lopez's car began to roll forward, moving a short distance before it stopped.  (*Id.* at 1:02:13–02:15; Escallada Dep. at 103:11–21.)  As the car was moving, Escallada and Valenzuela continued their use of force, with Valenzuela repeatedly striking Lopez with his baton and Escallada kicking Lopez's leg as the officers ordered Lopez out of his car.  (Dashcam at 1:02:18–03:00; Escallada Dep. at 103:11-104:2.)  After the car stopped, two other officers arrived, assisting Escallada and Valenzuela in pushing and pulling Lopez out of his car and onto the ground.  (Dashcam at 1:02:52.)  While three officers, including Valenzuela and Escallada, held Lopez down to handcuff him, the fourth officer stopped Lopez's

---

[5]    At oral argument, Defendants' counsel admitted Lopez put his hands up in a position that could be construed as surrender and backed up.

car, which had again begun to roll away. (*Id.* at 1:03:09.) As all four officers then attempted to cuff Lopez, who was lying on the ground, both Valenzuela and an unidentified officer used their batons on Lopez, repeatedly striking his lower body until Lopez was in handcuffs. (*Id.* at 1:03:24–1:03:47.)

Plaintiff and Defendants dispute the reason Lopez's car began rolling forward. Lopez contends that the struggle to extract him from his car could have accidentally "knocked the gear shift into drive." (SS. at No. 46.) Defendants, however, assert Lopez intentionally moved the car in an attempt to flee. (Escallada Dep. at 103:11-12.) Another point of dispute is whether Valenzuela used his knee to strike Lopez's face while attempting to extract Lopez from his vehicle, as Lopez contends. (See SS. at No. 75; Valenzuela Dep. at 55:2–56:24.) Defendants assert that the vehicle's "cockpit obstruct[ed] the strike." (*Id.*)

After placing him in handcuffs, the officers brought a bruised and bleeding Lopez near Escallada's vehicle to await an ambulance. (Dashcam at 1:05:18–05:28; 1:11:29.) Lopez complained to the officers about the force used on him, particularly an alleged baton blow to the head, while the officers repeated that Lopez "should've known better." (*Id.* at 1:10:08.) Escallada subsequently arrested Lopez for resisting arrest with violence, driving under the influence, and assaulting a peace officer with a deadly weapon. (Escallada Dep. at 101:17-103:8; SS. No. 55.) Lopez's blood test revealed he was not under the influence of alcohol or drugs at the time of his arrest. (ECF 31-2 at Ex. 2 (Alcohol Analysis & Toxicology Screening); SS No. 55.) Ultimately, the County pressed no charges against Lopez. (ECF No. 31-3 at ¶ 3.)

Lopez subsequently commenced this action in state court alleging (1) assault and battery, (2) negligence, (3) unreasonable seizure and excessive force under 42 U.S.C. § 1983, (4) violations of his Fourteenth Amendment rights to substantive due process under 42 U.S.C. § 1983, (5) unlawful custom and practice under 42 U.S.C. § 1983, and (6) violations of California Civil Code Sections 51, 51.7, 52, and 52.1. (*See* Compl.)

1

## II.    STATEMENT OF LAW

2

3        Summary judgment is appropriate under Federal Rule of Civil Procedure 56

4    when the moving party demonstrates the absence of any genuine issue of material fact

5    and entitlement to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp.*

6    *v. Catrett*, 477 U.S. 317, 322 (1986).   A fact is "material" if it "might affect the

7    outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477

8    U.S. 242, 248 (1986); *see also George v. Morris*, 736 F.3d 829, 834 (9th Cir. 2013).

9    A dispute about a material fact is "genuine" if "a reasonable jury could return a verdict

10   for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also FreecycleSunnyvale*

11   *v. Freecycle Network*, 626 F.3d 509, 514 (9th Cir. 2010).  "Disputes over irrelevant or

12   unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv.,*

13   *Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (citing

14   *Anderson*, 477 U.S. at 248).

15        A party seeking summary judgment without the ultimate burden of persuasion

16   at trial bears the initial burden of production and the ultimate burden of establishing

17   the absence of a genuine issue of material fact.  *See Celotex Corp.*, 477 U.S. at 322-

18   23; *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

19   The moving party can satisfy the burden of production in two ways: (1) by producing

20   "evidence negating an essential element of the nonmoving party's claim or defense;"

21   or (2) by demonstrating that the nonmoving party "does not have enough evidence of

22   an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire*

23   *& Marine Ins. Co.*, 210 F.3d at 1102; *see also Celotex Corp.*, 477 U.S. at 322-23; Fed.

24   R. Civ. P. 56(c)(1).

25        At the summary judgment stage, the focus is not on the admissibility of the form

26   of the evidence offered by a party to support or dispute a fact, but on the admissibility

27   of its contents. *Fraser v. Goodale*, 342 F.3d 1032, 1036-37 (9th Cir. 2003) (citing

28   *Block v. City of L.A.*, 253 F.3d 410, 418-19 (9th Cir. 2001)).  If the moving party "fails

     to carry its initial burden of production, the nonmoving party has no obligation to

produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co.*, 210 F.3d at 1102-03.  However, if the moving party meets its burden of production, the burden then shifts to the non-moving party to produce admissible evidence to support its claim or defense.  *Id.* at 1103.  "If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment." *Id.*; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'").

In considering a motion for summary judgment, a court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co.*, 475 U.S. at 587-88 (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when the judge] is ruling on a motion for summary judgment." *Anderson*, 477 U.S. at 255.

## III.   DISCUSSION

Defendants move for summary judgment on all of Lopez's causes of action. Defendants claim they are entitled to summary judgment on Lopez's excessive force and substantive due process claims on the following grounds: (1) because the officers' use of force was reasonable and necessary; (2) their conduct did not violate Lopez's substantive procedural rights; and (3) qualified immunity shields the officers from liability.  Defendants assert they are also entitled to summary judgment on Lopez's remaining claims, as those claims rely on a finding of either excessive force or a substantive due process violation.  Defendants further argue that Lopez's negligence cause of action against defendant City of Imperial ("City") must fail as a matter of law.  Finally, Defendants contend that Lopez's state law claims against Defendants for violation of his civil rights fail under California Civil Code Sections 51, 51.7, 52,

1    and 52.1.  The Court will address each of these claims in turn.

2        **A.    § 1983 Claim for Excessive Force (Third Cause of Action)**

3        Defendants move for summary judgment on Lopez's excessive force claim

4    arguing that Escallada's and Valenzuela's actions "did not amount to an excessive use

5    of force[,]" since they had "no reasonable option other than to use force in order to

6    effectuate the arrest."  (Mot. at p. 14.)  Lopez opposes the motion arguing that triable

7    issues of fact exist as to whether the officers' use of force was objectively reasonable.

8    (Opp. at pp. 19-21.)

9        "Determining whether the force used to effect a particular seizure is reasonable

10   under the Fourth Amendment requires a careful balancing of the nature and quality of

11   the intrusion on the individual's Fourth Amendment interests against the

12   countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386,

13   396 (1989) (internal quotation marks and citation omitted).  A court must first consider

14   the nature and quality of the intrusion, evaluating the type and amount of force

15   inflicted.  *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (citing *Deorle v.*

16   *Rutherford*, 272 F.3d 1272, 1279-80 (9th Cir. 2001)); *Chew v. Gates*, 27 F.3d 1432,

17   1440 (9th Cir. 1994).  Next, the court must determine the government's interest at

18   stake in the use of force, weighing factors "including the severity of the crime at issue,

19   whether the suspect poses an immediate threat to the safety of the officers or others,

20   and whether he is actively resisting arrest or attempting to evade arrest by flight."

21   *Graham*, 490 U.S. at 396; *see also Mattos*, 661 F.3d at 441 (citing *Deorle*, 272 F.3d

22   at 1279-80).  "These factors, however, are not exclusive.  Rather, [courts should]

23   examine the totality of the circumstances and consider 'whatever specific factors may

24   be appropriate in a particular case, whether or not listed in *Graham*.'"  *Bryan v.*

25   *MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010) (quoting *Franklin v. Foxworth*, 31

26   F.3d 873, 876 (9th Cir. 1994)).

27       The reasonableness of a particular use of force requires taking the "perspective

28   of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."

*Graham*, 490 U.S. at 396.  "The right to make an arrest carries with it the right to employ some level of force to effect it." *Bryan*, 630 F.3d at 818 (citing *Graham*, 490 U.S. at 396).  Thus, a "court must consider that the officer may be reacting to a dynamic and evolving situation, requiring the officer to make split-second decisions." *Id.* (citing *Graham*, 490 U.S. at 396-97).  "[A]n officer need not have perfect judgment, nor must he resort only to the least amount of force necessary to accomplish legitimate law enforcement objectives." *Id.*

Because the excessive force inquiry ordinarily "requires a jury to sift through disputed factual contentions, and to draw inferences therefrom," the Ninth Circuit has emphasized that "summary judgment . . . in excessive force cases should be granted sparingly." *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005) (citing *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002)); *see also Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011) ("Where the objective reasonableness of an officer's conduct turns on disputed issues of material fact, it is a question of fact best resolved by a jury.").  However, at the summary judgment stage, once the court has "determined the relevant set of facts and drawn all inferences in favor of the nonmoving party *to the extent supportable by the record*," the question of whether or not an officer's actions were objectively reasonable under the Fourth Amendment is a "pure question of law." *Scott v. Harris*, 550 U.S. 372, 381 n. 8 (2007); *see also Torres*, 648 F.3d at 1123.

### 1.   <u>Nature and Quality of the Intrusion</u>

A court measures the gravity of the particular intrusion that a given use of force imposes upon an individual's liberty interest with reference to "the type and amount of force inflicted." *Young v. Cnty. of L.A.*, 655 F.3d 1156, 1161 (9th Cir. 2011) (quoting *Deorle*, 272 F.3d at 1279).  Neither party disputes that Valenzuela struck Lopez's body multiple times with his baton,[6] or that Escallada pepper-sprayed Lopez's

---

[6]   In total, Lopez asserts Valenzuela landed "some 28 baton strikes" on his

eyes, kicked Lopez while trying to extract him from the vehicle, and placed his knee on Lopez's neck while trying to handcuff him.[7] (*See* SS. at Nos. 42-45, 48, 53-54; Dashcam at 1:01:42–03:45.)  Lopez additionally claims that Escallada kneed Lopez's face twice while attempting to remove Lopez from his vehicle and "rammed his knee on to the top of Lopez'[s] head, neck[,] and shoulder . . . while simultaneously handcuffing Lopez'[s] left wrist."  (Opp. at 8:14–17; SS. at Nos. 49, 75.)  Defendants dispute whether Escallada's knee actually hit Lopez during the struggle in the vehicle and assert Escallada only "placed" his knee on Lopez while trying to handcuff him. (*See* SS. at Nos. 49, 53.)

"Both pepper spray and baton blows are forms of force capable of inflicting significant pain and causing serious injury.  As such, both are regarded as 'intermediate force' that, while less severe than deadly force, nonetheless present a significant intrusion upon an individual's liberty interests."  *Young*, 655 F.3d at 1161-62; *Bryan*, 630 F.3d at 810 (an intermediate, significant level of force must be justified by the governmental interest involved).  A baton blow is considered a significant use of force, capable of causing not only pain, but potentially severe bodily injury.  *See Young*, 655 F.3d. at 1162.  Similarly, pepper spray "is *designed* to cause intense pain," and "inflicts 'a burning sensation that causes mucus to come out of the nose, an involuntary closing of the eyes, a gagging reflex, and temporary paralysis of the larynx,' as well as 'disorientation, anxiety, and panic.'"  *Id.* (quoting *Headwaters Forest Def. v. Cnty. of Humboldt*, 240 F.3d 1185, 1199-1200 (9th Cir. 2000) ("*Headwaters I*"), *vacated and remanded on other grounds*, 534 U.S. 801 (2001)).  Thus, there is no question that baton blows and the use of pepper spray constitute

---

body.  (Opp. at 7:16–18.)

[7]      In his deposition, Escallada admitted to kicking Lopez while trying to pull him from the vehicle.  (Escallada Dep. at 103:20–21.)  Valenzuela stated he "tr[ied] to apply knee strikes," although he could not remember how many or whether he hit Lopez's face.  (Valenzuela Dep. at 56:9–24.)

sufficiently serious intrusions upon an individual's liberty that they must be justified by a commensurately serious state interest.  *See id*. at 1162-63.

Fist and knee strikes may also be considered a significant use of force.  *See Davis v. City of Las Vegas*, 478 F. 3d 1048, 1055 (9th Cir. 2007) (finding the use of force "extremely severe" where the officer forcefully slammed an arrestee head-first against a wall, then swung him face-first to another wall, threw him face-down onto the floor, placed a knee in his back, and then turned him over and punched him in the face); *Aranda v. City of McMinnville*, 942 F. Supp. 2d 1096, 1105 (D. Or. 2013) (finding officer's use of closed fist and knee to deliver "multiple 'focused blows' to [an arrestee's] head, shoulder, and side" to be a significant use of force).  While using knee placement to restrain and handcuff an arrestee may be a less significant use of force depending on the circumstances, an officer ramming his knee into an arrestee's back tends towards being excessive, even given an arrestee's resistance.  *Compare Shreve v. Jessamine Cnty. Fiscal Ct.*, 453 F.3d 681, 687 (6th Cir. 2006) (holding a genuine issue of material fact existed as to whether officers placed a knee across an arrestee's back to prevent her from wriggling free, or jumped up and down on the arrestee's back repeatedly with a knee, but, taking the latter account as true, "no reasonable policeman could see [that action] as nonexcessive")), with *Forrester v. City of San Diego*, 25 F.3d 804, 807 (9th Cir. 1994) (finding physical pressure administered on limbs in increasing degrees, resulting in pain, to be less significant use of force than physical blows), and *Drummond ex rel. Drummond v. City of Anaheim*, 343 F. 3d 1052, 1056-57 (9th Cir. 2003) (finding officers who pressed their weight on an arrestee's neck and torso as he lay handcuffed on the ground and begged for air to be a severe use of force, capable of causing death or serious injury).

Given the multiple blows, including baton blows, landed by Valenzuela, there is no question that the force used by Valenzuela constituted a sufficiently serious intrusion upon Lopez's liberty interests to require the justification of a "commensurately serious state interest."  *See Young*, 655 F.3d. at 1162-63.  Similarly,

the use of pepper–spray by Escallada, as well as the body kicks and knee strikes by both officers, are a serious intrusion on Lopez's liberty interests.  The Court therefore turns to examine whether indisputable facts support the existence of a governmental interest in using such force that outweighs the intrusion on Lopez's liberty interest.

### 2.    Government's Interest in the Use of Force

To measure the government's interest in the use of force, courts look at the totality of the circumstances, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  *Graham*, 490 U.S. at 396.  Of these three factors, "the most important is whether the individual posed an immediate threat to [the] officer or public safety."  *Young*, 655 F.3d at 1163 (citing *Smith*, 394 F.3d at 702).

### a.    *Severity of the Crime*[8]

Escallada initially stopped Lopez and requested he perform an FST on suspicion of a DUI.  Defendants assert that Lopez's "resistance . . . [, particularly] his effort at driving away with the officers hanging on to him" then elevated his behavior to "actively resisting arrest and . . . assault on a police officer." (Mot. at p. 16.)  While

---

[8]      The parties dispute whether the officers had reasonable suspicion to perform the initial traffic stop.  However, the legality of the traffic stop does not control the inquiry into whether excessive force was used.  *See Fogarty v. Gallegos*, 523 F.3d 1147, 1160 (10th Cir. 2008) ("Although we have concluded that [the] arrest was not supported by probable cause, this does not mean that the force used . . . was automatically excessive, as the two inquiries are entirely independent."); *Godoy v. Brock*, No. 3:13-CV-0194, 2014 WL 4666938, at *6 (S.D. Cal. Sept. 18, 2014) (holding that a claim for excessive force premised solely on lack of probable cause to make an arrest failed as a matter of law).  An inquiry into the basis for the traffic stop is only relevant insofar as it clarifies the objective reasonableness of the officers' belief that the severity of the suspected crime justified the use of force.  *See e.g., Bryan v. MacPherson*, 630 F.3d 805, 828-29 (9th Cir. 2010) (holding that even if the arresting officer had reason to believe the arrestee committed several misdemeanors, those crimes were not serious enough to warrant the officer's use of force).

Lopez asserts he was not engaged in a crime, because he was, in fact, sober at the time of his arrest, the relevant inquiry is whether the officers had reason to believe Lopez had committed a crime severe enough to justify the use of force at the time, not whether Lopez had actually committed such a crime. (*See* Opp. at 21:3-4 ("Lopez did not engage in any 'crime,' much less a severe crime that would warrant such a physical beating at the hands of the police.").)

At the time of the arrest, Fonseca and Escallada claim to have, at most, simply observed Lopez swerving while driving and suspected he was under the influence of alcohol. Thus, the nature of the crime for which Lopez was stopped provides little basis for the use of force. *See Bryan*, 630 F.3d at 828 ("Traffic violations generally will not support the use of a significant level of force."); *Wiley v. Wash. St. Patrol*, No. C05-1948RSM, 2007 WL 1655273, at *7 (W.D. Wash., June 7, 2007) (finding the nature of a suspected DUI evidenced by speeding and reckless driving provided "little, if any, basis for the troopers' use of physical force" against an individual); *see also Parker v. Gerrish*, 547 F. 3d 1, 9 (1st Cir. 2008) ("Though driving while intoxicated is a serious offense, it does not present a risk of danger to the arresting officer that is presented when an officer confronts a suspect engaged in an offense like robbery or assault."); *Begay v. United States*, 553 U.S. 137, 141-48 (2008) (finding DUI not to be a crime of violence under the Armed Career Criminal Act, noting that it is not defined by violent and aggressive conduct).

Lopez's subsequent refusal to comply with the officers' orders and resistance provides a more compelling basis for the use of force. However, resistance to arrest does not rise to the level of a serious offense under the *Graham* analysis. *See Young*, 655 F.3d at 1164–65 ("[W]hile disobeying a peace officer's order certainly provides more justification for force than does a minor traffic offense, such conduct still constitutes only a non-violent misdemeanor offense that will tend to justify force in far fewer circumstances than more serious offenses, such as violent felonies."); *LaLonde v. Cnty of Riverside*, 204 F.3d 947, 959 (9th Cir. 2000) (finding that although

the plaintiff resisted arrest, it weighed in his favor that he was being arrested for the relatively minor offense of disturbing the peace); *Smith*, 394 F.3d at 702-03 (recognizing that although police were called because of alleged domestic abuse, which is serious and reprehensible, the circumstances did not "warrant the conclusion that [the plaintiff] was a particularly dangerous criminal or that his offense was particularly egregious;" thus the nature of the crime at issue provided little, if any basis for the officers' use of physical force); *Mattos*, 661 F.3d at 444 (finding no serious offense involved where the plaintiff was initially pulled over for speeding and then detained because she refused to sign a traffic citation, even though the plaintiff was ultimately charged with resisting arrest).  Under the circumstances, the Court finds this factor weighs in favor of Plaintiff.

### b.   *Immediate Threat*

Defendants contend that Lopez's refusal to comply with instructions, his large stature and aggressive posture, and the possibility he might be carrying an off-duty weapon in his car presented an immediate threat to their safety before Escallada and Valenzuela even began using force.  (Mot. at p. 15.)  Defendants further argue that Lopez's alleged "attempt[] to drive away" placed Escallada, Valenzuela, and the two unidentified officers in "imminent danger of serious bodily injury or death."  (*Id.* at 15:17–22.)  Lopez argues that he did not present a legitimate threat of violence "until 'rushed' by . . . Escallada at the onset of the physical altercation."  (Opp. at 20:12–14.)  Lopez adds that he never attempted to physically harm the officers at any point during the encounter and contends that his vehicle shifted into drive due to the struggle, not as a result of an effort by him to flee.  (*Id.* at 20:16–18.)

"[A] simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern." *Deorle*, 272 F.3d at 1281.  Moreover, "[a] desire to resolve quickly a potentially dangerous situation is not the type of governmental interest that, standing alone, justifies the use of force that may cause serious injury.  There must be other significant

1 circumstances that warrant the use of such a degree of force at the time it is used." *Id.*

2 at 1281; *see also Bryan v. MacPherson*, 630 F.3d 826.

3                                    i.    Initial Encounter[9]

4           From the Dashcam, Lopez does not appear to be significantly larger than the

5 two officers, and his initial behavior, while argumentative, does not appear threatening

6 or aggressive.  Lopez does not make any moves towards the officers, he does not

7 appear erratic, and he does not significantly raise his voice.  At the time he was pulled

8 over, Lopez informed the officers that he was a former deputy sheriff and U.S.

9 Marshal.  Based on this statement, Escallada testified he believed Lopez could have

10 been carrying an off-duty weapon, but, when asked on scene, Lopez denied having an

11 off-duty weapon and he does not reach into the car or towards his waist band as if

12 reaching for a weapon prior to the attempted arrest.  (*See* Escallada Dep. at 78:22-

13 79:4.)

14          Throughout the initial encounter, Lopez consistently maintains that he is not

15 drunk and does not drink because he is diabetic.  Lopez also consistently maintains

16 that he was not swerving but that he was changing lanes because he was being

17 followed by a truck with high beams.  At the time he requested an FST, Escallada did

18 not smell any alcohol, but testified Lopez had red, watery eyes and considered his

19 "belligerent, uncooperative, [and] argumentative" attitude to be an indication that he

20 was drunk.  (Escallada Dep. at 64:4-11; 96:12-15.)   Valenzuela also considered

21 Lopez's argumentative and questioning behavior to be a sign that Lopez was under

22 the influence.  (Valenzuela Dep. at 25:23-24:15.)

23          Initially, Lopez follows the officers' directions by pulling over, handing over

24 his license, getting out of the car, and removing his hat when requested.  Lopez's first

25 apparent act of "resistance" is his refusal to take the FST.  After Lopez refuses to put

26

27 _____

28          [9]     The following description of the events is taken from the Dashcam,
unless otherwise indicated.

his feet together so that Escallada can conduct the FST, Escallada informs Lopez he is about to put him into handcuffs.  (SS. at No. 35.)  Lopez continues to refuse to take the FST and refuses to turn around at Escallada's request.  (*Id.* at Nos. 36-38.)  The parties do not dispute that Escallada and Valenzuela both ordered Lopez to turn around three times and Lopez did not obey the officers' orders.  (*Id.* at No. 39.)

As Escallada and Valenzuela approach Lopez to effectuate the arrest, Lopez raises his arms and backs away towards his car, still trying to argue his way out of being arrested.  Both officers reach for Lopez, but he bats their hands away, refusing to be handcuffed.  (*Id.* at No. 40.)  When Lopez continues to refuse to turn around, Valenzuela takes out his baton and strikes Lopez's thigh.  Valenzuela testified that he felt Lopez, by "putting his hands up by his chest, [and] taking a position and cornering himself in the [car] door," was engaging in "preaggressive" behavior that he considered a threat to his personal safety.  (Valenzuela Dep. at 40:10-19.)  Valenzuela considered Lopez's "preaggressive" behavior to be a threat due to Lopez's size and demeanor throughout the traffic stop, as well as his refusal to take the field sobriety test and him cornering himself near his car.  (*Id.* at 40:20-25.)  Valenzuela also testified that he is "not going to try to take somebody into custody as strength for strength[, because he's] not a strong guy," but will rather "use the tools afforded to [him]."  (*Id.* at 54:14-17.)[10]

Ninth Circuit case law makes clear that passive or minor resistance to arrest alone does not constitute an immediate threat justifying the use of intermediate force.  *See Smith*, 394 F.3d at 702 (finding an uncooperative arrestee who shouts expletives at officers and who refuses to turn around and place his hands on his head is not an immediate threat justifying the use of intermediate force); *Bryan*, 630 F.3d at 826-28

---

[10]     While the Court must consider the facts without regard to the arresting officer's subjective motivation for using force, "the officers' underlying motivations could cast doubt on their version of the incident." *Winterrowd*, 480 F.3d at 1185 n. 7 (internal quotation marks omitted).

(finding an unarmed man engaging in erratic but nonviolent behavior and shouting expletives at officers from fifteen to twenty-five feet away does not constitute an immediate threat justifying the use of intermediate force); *Mattos*, 661 F.3d at 444-45, 449 (finding unarmed woman inside a car who "stiffened her body and clutched her steering wheel to frustrate the officers' efforts to remove her from the car" did not present an immediate threat after the keys were removed from the ignition; and finding a woman standing between an officer and individual who the officer intended to arrest who defensively extended her arm to stop her chest from being smashed against the officer's body did not pose an immediate threat); *Winterrowd v. Nelson*, 480 F.3d 1181, 1185 (9th Cir. 2007) (finding that verbal objections to being arrested and a "belligerent attitude," where the arrestee claims he was neither threatening nor physically abusive, pose no physical danger and thus cannot justify slamming the arrestee against the hood of a car).

At the time Valenzuela first struck Lopez with his baton, Lopez was passively resisting arrest. He made no verbal threats or physical moves towards the officers, who outnumbered him, other than batting their hands away. He was agitated and upset, but not belligerent or aggressive. Other than resisting arrest, he complied with the officer's requests. He did not reach for a weapon or dive into his car. While Escallada testified he believed Lopez may have been carrying an off-duty gun, there is nothing on the record to suggest the officers saw a gun or Lopez made a move towards or reached for a gun. Moreover, Escallada initially asked Lopez if he had a weapon, which Lopez denied. While Lopez's eyes may or may not have been red and watery, there is nothing to suggest he was clearly intoxicated, as he was upright and coherent. Further, while Lopez was standing near his open car door and slowly backing towards it, the car was stopped and aimed at a nearby gate, not the officers. At the time Valenzuela initially struck him, Lopez was still trying to talk his way out of being arrested. Altogether, there is nothing to suggest Lopez posed an immediate threat to the officers at the time Valenzuela first struck him with his baton. *See Smith*,

394 F.3d at 702 (finding that although the plaintiff was uncooperative and shouting expletives, a rational jury could find he did not pose a danger to the officers where he made no threats, verbal or physical, toward the officer or anyone else, and there was no suggestion he had access to a weapon).

                    ii.        <u>After Initial Baton Strike and Before Car</u>

After Valenzuela strikes Lopez, Escallada immediately attempts to control Lopez by grabbing his neck in an attempt to wrestle Lopez to the ground, but Lopez pushes him off. (SS. at No. 41.) As Lopez continues to argue his arrest, Valenzuela strikes him several more times with his baton. (*Id*. at Nos. 42-43.) At that point, Escallada uses his pepper spray without warning, hitting Lopez in the face. (*Id*. at No. 44.) After Lopez is pepper sprayed, he climbs into the open door of his car and sits down. (*Id*.) The car does not move forward at this time.

At this point, while Lopez engaged in more than passive resistance by pushing Escallada away from him, he thereafter did not make a move towards the officers or engage in aggressive or threatening behavior. Lopez did not attempt to strike or harm the officers; in fact, most of Lopez's physical resistance consisted of moving *away* from the baton blows and strikes of the arresting officers, toward the relative safety of his vehicle. (*See* Lopez Dep. at 108:23–109:4 (Lopez asserts he was in the car because a blow to his head knocked him inside the vehicle).) Therefore, despite Lopez's acts of resistance, there is nothing to suggest Lopez presented an immediate threat to the officers' safety justifying the use of pepper spray or multiple baton strikes. *See Aranda*, 942 F. Supp. 2d at 1100-06 (finding "a jury could find that a reasonable officer should have determined that [an arrestee] did not pose an immediate or serious threat" when his physical response could plausibly have been "an instinctive effort to protect himself from injury," where the arrestee "did not reach his hands for his waistline or make other sudden moves that would suggest aggressiveness . . . [nor did he] utter any threats [directed toward the arresting officers], but instead of complying with instructions to place his hands behind his back, the arrestee kept his hands raised

"to deflect the blows to his face.").  Compare *Hinton v. City of Elwood, Kan.*, 997 F. 2d 774, 776-781 (10th Cir. 1993) (finding it "difficult to maintain that [the plaintiff] constituted any type of immediate threat to the police or public" where "[t]here was no showing that [the plaintiff, walking down the street with his and his neighbor's children,] had a weapon or was under the influence of alcohol or drugs . . . [and] was outnumbered by the arresting officers," even though the plaintiff shoved the police officer, walked away, and then continued to struggle against the arrest by kicking his feet, flailing his arms, and biting the officers), with *Lindsay v. Kiernan*, 378 F. App'x. 606, 608 (9th Cir. 2010) (finding that the plaintiff's "intoxicated state, increasing hostility, physical resistance, and repeated refusal to leave the gas station could have led a reasonable officer to believe that [the plaintiff] posed an immediate threat to the safety of the officers and the safety of the young female convenience store clerk.")[11]

### iii.   Inside Lopez's Car

As Lopez sits down in the driver's seat, Valenzuela strikes him with a baton. (SS at No. 45.)  As soon as he is seated, both officers grab Lopez and attempt to pull him out of the car.  Lopez continuously yells, "Leave me alone."  Initially, the officers try to remove Lopez from the car by pulling on him, but after he refuses to leave the car, Valenzuela applies multiple strikes with his knee.  After approximately five seconds in the car, Lopez's car rolls slowly forward with both officers hanging onto

---

[11]   In making this determination, the Ninth Circuit cited *Draper v. Reynolds*, 369 F.3d 1270, 1278 (11th Cir. 2004).  In *Draper*, a police officer pulled over the plaintiff who was "hostile, belligerent, and uncooperative."  *Draper*, 369 F.3d at 1278. A police officer used his taser on the plaintiff after he asked him to retrieve documents from his truck "[n]o less than five times," and each time the plaintiff refused to comply.  *Id*.  Instead, the plaintiff accused the officer "of harassing him and blinding him with the flashlight[, . . . ] used profanity, moved around and paced in agitation, and repeatedly yelled at [the officer]."  *Id*.  The Eleventh Circuit found the use of the taser gun to effectuate the arrest to be "reasonably proportionate to the difficult, tense and uncertain situation" the officer faced and did not constitute excessive force.  *Id*.; *but see Bryan v. MacPherson*, 630 F.3d 805, 827 (9th Cir. 2010) ("We do not adopt *Draper* as the law of this circuit . . . .").

Lopez.  The car comes to a stop a short distance later.  The parties dispute the reason why the car moved (*see* SS. No. 46.), but construing the facts in the light most favorable to Lopez, the Court will presume it rolled forward by accident.[12]

After the car rolls forward, Valenzuela applies baton strikes again and both officers kick Lopez in an apparent attempt to drag him out of the car.  Lopez is still repeatedly screaming at the officers, "Leave me alone," while the officers are yelling at him to "get out of the car" and "get on the ground."  The parties do not dispute that at some point while being hit in the car Lopez agrees to take an FST.  (Escallada Dep. at 95:1-96:7.)  After agreeing to do so, however, Defendants claim Lopez continues to refuse to get out the car.  It is unclear, however, whether the officers gave Lopez any opportunity to get out of the car and comply.  At one point, Lopez appears to be climbing out of the car, but the officers continue to strike him, forcing him back in.

After Lopez sits down in the car, the potential threat at this point was not necessarily from Lopez, who did not fight back but instead asked repeatedly to be left alone and consented to the FST, but from the car itself, particularly when it started to move forward.  Before the car moved forward, the mere fact Lopez was sitting in the car and passively resisting arrest by holding on to the steering wheel does not suggest an immediate threat justifying baton and knee strikes.  *See Mattos*, 661 F.3d at 444, 449 (finding unarmed woman inside a car who "stiffened her body and clutched the steering wheel to frustrate the officers' efforts to remove her from the car" did not present an immediate threat after the keys were removed from the ignition).

After the car moved forward and the officers who continued to attempt to pry Lopez from the car were being dragged along, however, the potential threat to the officers becomes more objectively apparent.  Whether or not a moving vehicle

---

[12]   The Court does note, however, that Lopez's leg stays outside the open car door, on the ground, the entire time the car is moving, the car is not aimed at the officers but rather a large gate, and the car apparently stops without the officers needing to take control.

constitutes a threat requires a consideration of all the facts.  *See Gonzalez v. City of Anaheim*, 747 F.3d 789, 796 (9th Cir. 2014).  Here, given the opposing stories, whether or not the moving vehicle constituted an immediate threat is a disputed material fact.

### iv.    After Removal From Car

After two unidentified border patrol agents approach and assist, Lopez is dragged and pushed from the car.  After being forced to the ground, Lopez continues to resist arrest as the officers instruct him to put his hands behind his back.  Escallada and an unidentified border patrol agent struggle to hold Lopez face down and apply the handcuffs.  Escallada drops his knee on Lopez's neck and shoulders to control Lopez.  As Escallada is attempting to handcuff Lopez, Valenzuela applies at least one baton strike to Lopez's side.

Escallada succeeds in handcuffing Lopez's left wrist.  As Escallada attempts to place the other handcuff on him, Lopez informs the officers that "he can't breathe" and asks, "Please leave me alone."  After the officers are unable to place the second handcuff, the other unidentified border patrol agent joins in and Valenzuela and one of the unidentified border patrol agents apply several baton strikes to Lopez's body and Escallada stomps on Lopez's head.  The entire time he is on the ground, Lopez refuses to voluntarily put his arms behind his back.  As soon as Lopez is handcuffed, the officers stop applying force and back away.

After Lopez was removed from the vehicle and forced to the ground, he was undisputedly outnumbered four to one.  Lopez still continued to resist arrest by refusing to put both hands behind his back.  However, again, he does not fight back.  Instead, he informs the officers that he "can't breathe" and asks them to leave him alone.  While Lopez was resisting arrest at this point, there is no suggestion he was an immediate threat thereby justifying the multiple baton strikes and knee drops on his neck and shoulders.  *See Smith*, 394 F.3d at 702 (finding "[a]lthough it is true that until both of his arms were handcuffed, [the plaintiff] continued to shield one arm

from the officers and their dog and to shout expletives at the officers, considering the evidence in the light most favorable to him, a rational jury could very well find that he did not, at any time, pose a danger to the officers or others.")

### c.    *Attempts to Evade or Flee Arrest*

In light of the foregoing, no party disputes that Lopez resisted arrest during the encounter.  The inquiry, however, must go beyond merely determining whether Lopez resisted arrest, to determining whether the amount of force used by the officers to subdue Lopez was reasonable given the totality of the circumstances.  *See LaLonde*, 204 F.3d at 959 (finding that although defendant resisted arrest, if the injury to the arrestee is serious enough, a jury could conclude that the arresting officer used force in excess of what was reasonable); *see also Luchtel v. Hagemann*, 623 F.3d 975, 987-88 (9th Cir. 2010) ("The relevant inquiry is not whether the force the officers used was no greater than that required to overcome [an arrestee's] resistance. . . . [I]t is whether the force used was reasonable in light of *all* the relevant circumstances." (internal quotation marks and citation omitted)).

"[R]esistance runs the gamut from the purely passive protestor who simply refuses to stand, to the individual who is physically assaulting the officer." *Nelson v. City of Davis*, 685 F.3d 867, 881 (9th Cir. 2012) (citing *Bryan*, 630 F.3d at 830 (internal quotation marks omitted)).  "While 'purely passive resistance can support the use of some force, [] the level of force an individual's resistance will support is dependent on the factual circumstances underlying that resistance.'"  *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1091 (9th Cir. 2013) (quoting *Bryan,* 630 F.3d at 830).

"[A] failure to fully or immediately comply with an officer's orders neither rises to the level of active resistance nor justifies the application of a non-trivial amount of force."  *Nelson*, 685 F.3d at 881 (citing *Young*, 655 F.3d at 1165-66 (arrestee's repeated refusal to reenter vehicle at officer's command is not active resistance); *Davis*, 478 F.3d at 1055–56 (arrestee's actions in physically impeding the officer's

search of his pockets was not active resistance); *Smith*, 394 F.3d at 703 (arrestee's refusal to remove hands from pockets and his reentry into his home despite officers' orders to place hands on head and walk towards them was not active resistance); *Headwaters Forest Defense v. Cnty. of Humboldt*, 276 F.3d 1125, 1130 (9th Cir. 2002) ("*Headwaters II*") (protestors that remained seated and used "black bear" devices to lock themselves to one another despite officers' orders to disperse did not actively resist); *cf. Jackson v. City of Bremerton*, 268 F.3d 646, 652-53 (9th Cir. 2001) (arrestee who repeatedly physically interfered with officer's arrest of a third party was actively resisting)).  As the Ninth Circuit stated in *Nelson*:

> As our prior cases illustrate, active resistance is not to be found simply because of a failure to comply with the full extent of an officer's orders. To the contrary, where an individual's "resistance was [not] particularly bellicose," . . . we have held that various applications of force, including the use of pepper spray, . . . and bean bag projectiles, . . . were not reasonable. Therefore, even if [the plaintiff] heard and was in non-compliance with the officers' orders to disperse, this single act of non-compliance, without any attempt to threaten the officers or place them at risk, would not rise to the level of active resistance.  There is therefore no justification for the use of force to be found in the third *Graham* factor.

*Nelson*, 685 F.3d at 882 (internal citations omitted).  Again, in *Gravelet-Blondin*, the Ninth Circuit emphasized that even where an individual is not "perfectly passive," if the resistance of the individual is not "particularly bellicose," the third *Graham* factor offers little support for the use of significant force.  *Gravelet-Blondin*, 728 F.3d at 1092.

Lopez maintains he only resisted once Escallada precipitated a physical altercation by "rushing" Lopez and attempting to force his hands behind his back. (Opp. at 21:6–8.)  Lopez additionally claims he did not attempt to flee in his car, which Lopez claims was accidentally pushed into drive during the altercation within the vehicle.  Defendants, however, contend that Lopez began resisting by refusing to turn around to be handcuffed and then escalated his resistance, forcing Escallada and

1   Valenzuela to commensurately increase the amount of force they used.  (Mot. at
2   16:14–17:2.)

3          Based on the Dashcam, the fact-finder could reasonably find that Lopez's initial
4   movements were defensive, rather than combative.  Lopez did not attempt to strike or
5   fight the officers; in fact, most of Lopez's physical resistance consisted of moving
6   *away* from the baton blows and strikes of the arresting officers, toward the relative
7   safety of his vehicle.  (*See* Lopez Dep. at 108:23–109:4 (Lopez asserts he was in the
8   car because a blow to his head knocked him inside the vehicle).)   Under similar
9   circumstances, at least one other district court in the Ninth Circuit has held summary
10   judgment is inappropriate in an excessive force case when an arrestee's so-called
11   "resistance" could plausibly have been "an instinctive effort to protect himself from
12   injury."  *See Aranda*, 942 F. Supp. 2d at 1106.  In *Aranda*, the court emphasized that
13   the arrestee "did not reach his hands for his waistline or make other sudden moves
14   that would suggest aggressiveness . . . [nor did he] utter any threats [directed toward
15   the arresting officers]."  *Id.*  Rather than complying with instructions to place his hands
16   behind his back, the arrestee kept his hands raised near his head "to deflect the blows
17   to his face."  *Id.* at 1100.  Thus, the *Aranda* court concluded a jury could reasonably
18   find the arrestee's "noncompliance was not active resistance to arrest as much as an
19   instinctive effort to protect himself from injury."  *Id.* at 1106.  Lopez's refusal to lower
20   his hands and his movement into his vehicle could, similarly, be plausibly interpreted
21   as an instinctive response to the numerous baton blows and knee strikes.

22          In contrast, in *Lindsay*, officers were called to a gas station convenience store
23   because the young female clerk was concerned about an intoxicated man who insisted
24   on buying Zima beer and refused to leave.  *Lindsay*, 378 F. App'x. at 607.  When four
25   officers arrived, the plaintiff, a six foot tall, 220 pound man, was getting out of his taxi
26   "obviously intoxicated, angry, and belligerent."  *Id*.  The four officers surrounded the
27   taxi and repeatedly told the plaintiff to get back in the cab and leave the gas station.
28   *Id*.  The plaintiff refused and became increasingly hostile, insisting the officers go

with him to confront the gas station clerk so she would sell him Zima beer.  *Id*.  When the defendant officer grabbed the plaintiff's arm to prevent him from re-entering the store and confronting the clerk, he broke free, barreled through the other officers, and walked quickly towards the store, yelling, "Let's get the fuck in there and clean this place up."  *Id*.  When the plaintiff was close to the door of the store, the defendant officer asked him, "Okay you want the taser?"  The plaintiff stated, "I don't mind it," and continued walking towards the store.  *Id*.  The defendant officer employed his taser, an intermediate use of force, in dart mode on the plaintiff and he fell to the ground.  *Id*.; *see Bryan*, 630 F.3d at 810 (concluding the use of a taser constitutes an intermediate use of force).  The officers then instructed the plaintiff to put his hands behind his back and warned him he would receive the taser again if he refused.  *Id*.  When the plaintiff ignored these commands and attempted to get up, the defendant officer fired his taser a second time, enabling the officers to handcuff him.  *Id*.

The Ninth Circuit found it relevant and "undisputed that [the plaintiff], while heavily intoxicated, actively resisted the officers repeated verbal commands to leave the gas station, broke free from [the defendant officer]'s grasp, and barreled through five officers to confront the young female convenience store clerk," and that the plaintiff "ignored [the defendant officer]'s warning that he would deploy the taser unless [the plaintiff] complied with the officers' orders."  *Id*. at 609.  Thus, the Ninth Circuit found "[s]uch conduct qualifies as more than minor resistance."  *Id*.[13]  "In addition, a reasonable officer could have concluded that [the plaintiff] continued to actively resist arrest by attempting to get up after the first taser shot, despite officers' commands to stay down and submit to arrest."

---

[13]    The Ninth Circuit distinguished *Smith* by stating that the plaintiff in *Smith*, "who ignored some of the officers' commands, only engaged in minor resistance because he did not attempt to run from the officers and physically resisted for only a short time," unlike the plaintiff in *Lindsay*, who "refused to halt or comply with any of the officers' commands until after he was tased twice."  *Lindsay*, 378 F. App'x. at 608, n. 5.

Given the foregoing circumstances, a reasonable jury could conclude Lopez's resistance, while not "perfectly passive," was not "particularly bellicose," thereby justifying the use of an intermediate level of force. *See Gravelet-Blondin*, 728 F.3d at 1092. Particularly in light of the fact the parties do not dispute that Lopez agreed to take the FST and comply with the officers' orders.

### d.   *Additional Factors*

#### i.   Availability of Other Methods

The Ninth Circuit also recognizes other factors that may be considered in the *Graham* analysis, including the availability of alternative methods of capturing or subduing a suspect. *Smith*, 394 F.3d at 701 (citing *Chew*, 27 F.3d at 1441, n. 5); *Bryan*, 630 F.3d at 831. In the Ninth Circuit it is a "settled principle that police officers need not employ the 'least intrusive' degree of force." *Bryan*, 630 F.3d at 831, n. 15 (citing *Gregory v. Cnty. of Maui*, 523 F.3d 1103, 1107 (9th Cir. 2008)). However, "if there were clear, reasonable and less intrusive alternatives to the force employed, that militates against finding the use of force reasonable." *Glenn v. Wash. Cnty.*, 673 F.3d 864, (9th Cir. 2011) (internal citations and quotations omitted). In *Lindsay*, the Ninth Circuit found that "[g]iven the volatile situation, [the plaintiff]'s refusal to comply with any of the officer's verbal commands, and his physical resistance despite the presence of multiple officers, [the defendant officer] could have reasonably believed that deploying his taser after a warning would be the least intrusive method of subduing [the plaintiff]." *Lindsay*, 378 F. App'x. at 609. It is difficult to discern whether the officers could have used a less intrusive method to effectuate the arrest, particularly in light of the lack of any warning to Lopez about the imminent use of batons and pepper spray.

"[T]he absence of a warning of the imminent use of force, when giving such a warning is plausible, weighs in favor of finding a constitutional violation." *Gravelet-Blondin*, 728 F.3d at 1092 (citing *Mattos*, 661 F.3d at 451; *Deorle*, 272 F.3d at 1283-84). In *Gregory*, in determining no excessive force was used, the Ninth Circuit found

13cv597

relevant the fact that officers did not immediately engage in a physical confrontation with a "high strung, excitable and jumpy" man possibly high on drugs, even where they "had substantial grounds for believing that some degree of force was necessary" in effecting the arrest, but first asked him to drop a pen and only attempted to disarm him after he repeatedly and expressly refused to comply. *Gregory*, 523 F.2d at 1106-07.

Here, the officers did not warn Lopez before initially striking him with a baton or pepper spraying him in the face. As Lopez was not immediately threatening to the officers at the time, the officers had time and opportunity to warn Lopez before using such tactics. The officers spoke with Lopez for several minutes before they attempted to arrest him. Moreover, there were no exigent circumstances suggesting that the arrest had to be effected immediately. Accordingly, these factors weigh in favor of a finding of excessive force.

After weighing the foregoing factors, and considering the evidence in the light most favorable to Lopez, the Court finds that a reasonable jury could conclude the government's interest in the use of force did not outweigh the intrusion on Lopez's liberty interest.

### 3.   Qualified Immunity

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (*quoting Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity shields an officer from liability even if his or her action resulted from "'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" *Id.* (quoting *Groh v. Ramirez*, 540 U.S. 551, 567 (2004)). The purpose of qualified immunity is to strike a balance between the competing "need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability

1   when they perform their duties reasonably." *Id.*

2   "Determining whether officials are owed qualified immunity involves two
3   inquiries: (1) whether, taken in the light most favorable to the party asserting the
4   injury, the facts alleged show the official's conduct violated a constitutional right; and
5   (2) if so, whether the right was clearly established in light of the specific context of
6   the case." *Robinson v. York*, 566 F.3d 817, 821 (9th Cir. 2009) (citing *Saucier v. Katz*,
7   533 U.S. 194, 201 (2001)). The Supreme Court has instructed that courts may exercise
8   "sound discretion in deciding which of the two prongs of the qualified immunity
9   analysis should be addressed first." *Pearson*, 555 U.S. at 236.  If facts necessary to
10  decide the issue of qualified immunity are in dispute, then summary judgment
11  granting qualified immunity is not proper.  *LaLonde*, 204 F.3d at 953-54.

12  The Court has determined that the facts alleged could show Defendants'
13  conduct violated a constitutional right.  Therefore, the Court turns to step two in the
14  analysis.  For the second step in the qualified immunity analysis – whether the
15  constitutional right was clearly established at the time of the conduct – courts ask
16  whether its contours were "'sufficiently clear' that every 'reasonable official would
17  have understood that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, ——
18  U.S. ——, 131 S.Ct. 2074, 2083 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635,
19  640 (1987)).  While a case directly on point is not required, "existing precedent must
20  have placed the statutory or constitutional question beyond debate." *Id.*  The Supreme
21  Court has made "clear that officials can still be on notice that their conduct violates
22  established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730,
23  741 (2002).  Courts "are particularly mindful of this principle in the context of Fourth
24  Amendment cases, where the constitutional standard—reasonableness—is always a
25  very fact-specific inquiry." *Mattos*, 661 F.3d at 442.  "If qualified immunity provided
26  a shield in all novel factual circumstances, officials would rarely, if ever, be held
27  accountable for their unreasonable violations of the Fourth Amendment." *Id.*; *see
28  also Deorle*, 272 F.3d at 1286.  ("Otherwise, officers would escape responsibility for

the most egregious forms of conduct simply because there was no case on all fours prohibiting that particular manifestation of unconstitutional conduct.").

Courts should be "careful, however, to apply the clearly established rule in such a way that faithfully guards the need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority." *Id.* (citing *Harlow*, 457 U.S. at 807 (internal quotation marks and citations omitted)). Courts "must also allow 'for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.'" *Id.* (quoting *Graham*, 490 U.S. at 396–97).

While "in an obvious case, [the *Graham* standards for excessive force] can clearly establish the answer, even without a body of relevant case law," the "bar for finding such obviousness is quite high." *Id.* (citing *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004)). In *al-Kidd*, the Supreme Court emphasized that it has "repeatedly told courts not to define clearly established law at a high level of generality." *Id.* (quoting *al-Kidd*, 131 S.Ct. at 2084).

Defendants argue qualified immunity shields both Escallada and Valenzuela from liability for their actions. (Mot. at pp. 23-24.) Escallada claims he "did not act 'plainly incompetently' nor did he knowingly violate the law[,]" and Valenzuela claims he did not violate a "clearly established" right, since he allegedly used his baton in an appropriate and justified manner. (*Id.*) Defendants do not cite any case law in support of these assertions.

As the Ninth Circuit stated in *Gravelet-Blondin*, the "right to be free from the application of non-trivial force for engaging in mere passive resistance was clearly established prior to 2008." *Gravelet-Blondin*, 728 F.3d at 1093 (citing *Nelson*, 685 F.3d at 881); *see also Cordeiro v. United States*, No. 11-00413 JMS, 2013 WL 5514504, at *12 (D. Haw. Oct. 3, 2013) (summarizing case law). Thus, at the time of Lopez's arrest, the law clearly established that baton blows, pepper spray, and knee

strikes, which constitute intermediate force, against an uncompliant arrestee can be excessive. *See, e.g., Young*, 655 F.3d at 1166 (verbal and physical refusal to obey an officer's directions to reenter a vehicle did not justify pepper spray or baton blows); *see also Cordeiro*, 2013 WL 5514504, at *13 (use of pepper spray on a motorist seated inside his car, refusing to exit the vehicle, violated clearly established law).

Given that facts necessary to decide the issue of qualified immunity are in dispute, and the foregoing clearly established law, the Court finds Escallada and Valenzuela are not entitled to qualified immunity at this time. Given the foregoing, the Court **DENIES** Defendants' motion for summary judgment.[14]

## B. Fourteenth Amendment Claim (Fourth Cause of Action)

Lopez claims Defendants violated his substantive due process rights. The Court finds Defendants are entitled to summary judgment on this cause of action. In *Graham*, the Supreme Court held that "*all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." *Graham*, 490 U.S. at 395. As Lopez's claim arises from the baton strikes, pepper–spraying, and other force used upon him in the course of being arrested, his seizure exclusively implicates the Fourth Amendment. *See Ward v. City of San Jose*, 967 F.2d 280, 285 (9th Cir. 1991) ("It is reversible error to give a substantive due process instruction in an excessive force case after *Graham*."); *Eberle v. City of Anaheim*, 901 F.2d 814, 820 (9th Cir.1990))); *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 842-43 (1998); *Willingham v. City of San Leandro*, No. C-06-3744, 2006 WL 3734633, at *1

---

[14] The Court declines to consider the conclusions of Mr. Williams, introduced by Lopez to prove the use of force was excessive, as his conclusions on this and other points usurp the role of the factfinder. *See Billington v. Smith*, 292 F.3d 1177, 1189 (9th Cir. 2002) ("[E]ven for summary judgment purposes, the fact that an expert disagrees with the officer's actions does not render the officer's actions unreasonable.") (citation and internal quotation marks omitted).

1  (N.D. Cal. Dec. 18, 2006) (citing *Graham* and dismissing section 1983 claims based

2  on due process violations with prejudice).   Accordingly, Defendants' request for

3  summary judgment on Lopez's fourth cause of action is **GRANTED**.

   ### C.    Municipal Liability

5      Lopez seeks to hold defendants City and Chief Colon liable for constitutional

6  violations under section 1983.  In a section 1983 action, municipal liability cannot be

7  founded on a theory of *respondeat superior*.  *Webb v. Sloan*, 330 F.3d 1158, 1164 (9th

8  Cir. 2003) (citing *Gibson v. Cnty. of Washoe*, 290 F.3d 1175, 1185 (9th Cir. 2002));

9  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978) ("[A] municipality cannot be

10  held liable under § 1983 on a *respondeat superior* theory.").  "Instead, it is when

11  execution of a government's policy or custom, whether made by its lawmakers or by

12  those whose edicts or acts may fairly be said to represent official policy, inflicts the

13  injury that the government as an entity is responsible under § 1983." *Monell*, 436 U.S.

14  at 694.  Thus, the actions of an individual employee can only support liability against

15  a municipality where (1) the employee was acting pursuant to an official municipal

16  policy, (2) the employee commits a constitutional violation pursuant to a longstanding

17  practice or custom, or (3) the employee causing the violation has final policymaking

18  authority.  *Webb*, 330 F.3d at 1164 (citing *Pembaur v. City of Cincinnati*, 475 U.S.

19  469, 479 (1986); *Christie v. Iopa*, 176 F.3d 1231, 1235 (9th Cir. 1999)).

20      Defendants move for summary judgment on the basis that Lopez's *Monell* claim

21  cannot stand where "Lopez['s] § 1983 claim against the City fails."  (Mot. at p. 20.)

22  As a general proposition, the Court agrees.  *See City of Los Angeles v. Heller*, 475

23  U.S. 796, 799 (1986) ("If a person has suffered no constitutional injury at the hands

24  of the individual police officer, the fact that the departmental regulations might have

25  *authorized* the use of constitutionally excessive force is quite beside the point.")

26  However, as Lopez's excessive force claim survives summary judgment and

27  Defendants have failed to produce any evidence negating an essential element of

28  Lopez's *Monell* claim or demonstrated that Lopez does not have enough evidence to

1    carry his burden of persuasion at trial, *see Nissan Fire & Marine Ins. Co.*, 210 F.3d at

2    1102, Lopez's *Monell* claim also similarly survives.   Thus, the Court **DENIES**

3    Defendants' motion for summary judgment on Lopez's *Monell* claim.

     **D.**    **State Law Claims**

          **1.**    <u>**Assault and Battery (First Cause of Action)**</u>

6          Defendants move for summary judgment on Lopez's assault and battery claim

7    arguing "neither of the Defendant officers could have committed a battery since the

8    force they used was lawful."  (Mot. at p. 20.)  To prevail on his assault and battery

9    claim against all defendants, Lopez must prove the use of unreasonable force.  *Edson*

10   *v. City of Anaheim*, 63 Cal. App. 4th 1269, 1272 (1998) ("Plaintiff must prove

11   unreasonable force as an element of the tort [of battery]."), *cited in Saman v. Robbins*,

12   173 F.3d 1150, 1157 n. 6 (9th Cir. 1999).  "[T]he fact that [a p]laintiff's § 1983 claims

13   under the Fourth Amendment survive summary judgment also mandates that the

14   assault and battery claims similarly survive." *Nelson v. City of Davis*, 709 F. Supp. 2d

15   978, 992 (E.D. Cal. 2010).  Accordingly, the Court **DENIES** Defendants' motion for

16   summary judgment on Lopez's cause of action for assault and battery.

          **2.**    <u>**Negligence (Second Cause of Action)**</u>

18         Defendants move for summary judgment on Lopez's negligence cause of action

19   against all defendants on the grounds that neither the City nor Chief Colon can be held

20   liable for the officers' actions as a matter of law.  (Mot. at pp. 20-21.)  Defendants'

21   reading of California law regarding public entity liability, however, is incorrect.  In

22   *Carter v. City of Carlsbad*, 799 F. Supp. 2d 1147 (S.D. Cal. 2011), the defendants,

23   like Defendants here, argued that California Government Code section 815(a)

24   insulates a city from liability.  *Id.* at 1164-65.  In relevant part, section 815(a) provides

25   that "[a] public entity is not liable for an injury, whether such injury arises out of an

26   act or omission of the public entity or a public employee or any other person."  Cal.

27   Gov't Code § 815(a).  However, the *Carter* court rejected that argument on the basis

28   of California Government Code section 815.2, which "makes clear that a public entity

1  faces *respondeat superior* liability for injuries caused by its employees, and is only

2  immune from liability when the individual employee is also immune." *Carter*, 799 F.

3  Supp. 2d at 1165; *see* Cal. Gov't Code § 815.2.

4  The Court next turns to Defendants' argument that "neither the City nor its

5  Chief can be held liable for negligent hiring." (Mot. at 21:12-19.)   As Lopez's

6  opposition makes clear, he seeks to hold the City liable under the theory of *respondeat*

7  *superior*. (Opp. at 23:14–24:4; *see* Compl. at 9–10.)   Actions may be brought against

8  California public entities on the basis of vicarious liability for the actions of their

9  employees. *See Carter*, 799 F. Supp. 2d at 1165; *Gomez v. City of Fremont*, 730 F.

10 Supp. 2d 1056, 1070 (N.D. Cal. 2010) (denying summary judgment to the city and

11 police chief in an excessive force case, as they "may have vicarious liability under

12 state law for acts or omissions of the police officers acting within the scope of their

13 employment.").

14 Finally, Defendants argue that any negligence claim against the City or Colon

15 is without merit, because "[it] derives from the claim of excessive force." (Mot. at

16 21:20.)   Because Lopez's claim for excessive force survives, the Court **DENIES**

17 Defendants' motion for summary judgment on Lopez's second cause of action for

18 negligence.

19 ### 3.   <u>State Civil Rights Claims (Sixth Cause of Action)</u>

20 Lopez alleges defendants Colon, Valenzuela, and Escallada are liable for

21 violating California Civil Code sections 51, 51.7, 52, and 52.1. (Compl. at pp. 19-20.)

22 Defendants move for summary judgment on Lopez's sixth cause of action.

23 ### a.   *Section 52.1 Claim (The Bane Act)*

24 "California Civil Code § 52.1, also known as the Bane Act, serves as a state law

25 remedy for constitutional or statutory violations accomplished through intimidation,

26 coercion, or threats." *Davis v. City of San Jose*, ---F. Supp. 3d ---, 2014 WL 4772668,

27 at *5 (N.D. Cal. Sept. 24, 2014).   The Act enables civil actions for protection of rights

28 secured by the U.S. Constitution, if a person "interferes [or attempts to interfere] by

1   threat, intimidation, or coercion . . . with the exercise or enjoyment" of a right.  Cal.

2   Civ. Code § 52.1(a).  "Although analogous to § 1983, it is not tantamount to a § 1983

3   violation, requiring more than evidence of a violation of rights."  *Davis*, ---F. Supp.

4   3d ---, 2014 WL 4772668, at *5.

5          Defendants claim that the alleged coercion must be "independent from the

6   coercion inherent in a wrongful detention itself."  (Mot. at 22:4–5.)  In support of this

7   contention, Defendants cite to *Shoyoye v. Cnty. of L.A.*, 203 Cal. App. 4th 947 (2012),

8   in which a California appellate court held a plaintiff must prove coercion independent

9   from a wrongful detention to prevail under the Bane Act.  *Id.* at 960-61.  Subsequent

10  to *Shoyoye*, however, another California appellate court decided *Bender v. Cnty. of

11  L.A.*, 217 Cal. App. 4th 968 (2013) and held that "the Bane Act does not require a

12  showing of a violation of a constitutional right separate from the Fourth Amendment

13  violation" where there was excessive force applied in making an unlawful arrest.  *Id.*

14  at 977 n.4, 978.  In *Bender*, the court found the Bane Act applied "because there was

15  a Fourth Amendment violation—an arrest without probable cause—accompanied by

16  the beating and pepper spraying of an unresisting plaintiff, i.e., *coercion that is in no

17  way inherent in an arrest, either lawful or unlawful*."  *Id.* at 978 (emphasis added).  In

18  doing so, the court emphasized that it was not confronted with "a case involving the

19  use of excessive force during an otherwise lawful arrest based on probable cause."  *Id.*

20  However, subsequent courts have found the Bane Act to apply in excessive force cases

21  involving a lawful arrest.  *See e.g., Rodriguez v. City of Modesto*, No. 1:10-CV-01370-

22  LJO, 2013 WL 6415620, at *13 (E.D. Cal. Dec. 9, 2013); *Davis*, ---F. Supp. 3d ---,

23  2014 WL 4772668, at *6-7.  Thus, regardless of whether the arrest at issue was lawful

24  or not, the Bane Act does not require a showing of a violation of a constitutional right

25  separate from the Fourth Amendment violation.

26         Here, Lopez contends that the "beating [he] suffered" constitutes acts of threats,

27  intimidation, or coercion independent of his arrest.   (Opp. at 24:11–13.)   He

28  additionally claims that the officers went beyond merely making an arrest, to

attempting to physically hurt Lopez as revenge for his defiant attitude and seeming lack of cooperation.  (*Id.* at 22:9–13.)  Because Defendants' motion for summary judgment on Lopez's excessive force claim survives, the Court **DENIES** Defendants' motion for summary judgment on Lopez's claims under the Bane Act.

### b. *Claim Under Sections 51, 51.7, and 52*

The Court next considers Defendants' motion for summary judgment on Lopez's claims under California Civil Code sections 51, the Unruh Civil Rights Act, 51.7, and 52.  *See* Cal. Civ. Code §§ 51(a), 51.7(a).  Section 51 provides that all persons in California "are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, disability, medical condition, genetic information, marital status, or sexual orientation are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever."  Cal. Civ. Code § 51(b).

Section 51.7 provides that "[a]ll persons within [California] have the right to be free from any violence, or intimidation by threat of violence, committed against their persons or property" because of their "sex, race, color, religion, ancestry, national origin, disability, medical condition, genetic information, marital status, or sexual orientation."  Cal. Civ. Code §§ 51.7(b), 51(b).  In order to establish a section 51.7 claim, a plaintiff must show "(1) the defendant threatened or committed violent acts against the plaintiff; (2) the defendant was motivated by his perception of plaintiff's [protected classification, e.g., race]; (3) the plaintiff was harmed; and (4) the defendant's conduct was a substantial factor in causing the plaintiff's harm." *Knapps v. City of Oakland*, 647 F. Supp. 2d 1129, 1167 (N.D. Cal. 2009) (citation omitted).

Section 52 provides for damages for any person who "denies, aids or incites a denial, or makes any discrimination or distinction contrary to Section 51" or "denies the right provided by Section 51.7 . . . or aids, incites, or conspires in that denial." Cal. Civ. Code § 52(a) and (b).

Defendants move for summary judgment on Lopez's section 51.7 claim on the

– 36 –

grounds that "he has not alleged any facts indicating the officers discriminated against him for any of the protected classification under the Act." (Mot at p. 22.) Defendants further argue Lopez's claim fails because the Unruh Act prohibits discrimination of any kind against any person in any business establishment and the officers and the City are not business establishments for purposes of the Act. (*Id*. at pp. 22-23.)

As to the first argument, the Court agrees there is nothing in the Complaint suggesting Lopez was discriminated against on the basis of a protected classification. While Defendants' argument would have been more appropriate in a Federal Rule of Civil Procedure 12(b)(6) motion attacking the sufficiency of the allegations, Lopez does not dispute in his opposition to Defendants' summary judgment motion the argument there are no allegations indicating Defendants discriminated against him because of a protected classification, or provide any argument or evidence to the contrary. Accordingly, the Court **GRANTS** Defendants' motion for summary judgment on Lopez's state claims under California Civil Code sections 51, 51.7, and 52.

## IV. CONCLUSION & ORDER

For the foregoing reasons, Defendants' motion for summary judgment is **DENIED** in part and **GRANTED** in part (ECF No. 25). The parties shall file a joint proposed scheduling order setting forth motion *in limine*, final pretrial conference, and trial dates within 14 days of the date of this Order.

**IT IS SO ORDERED.**

**DATED:  July 2, 2015**

Hon. Cynthia Bashant
United States District Judge